J-S20042-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN THE INTEREST OF: D.S., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: R.E.S. :
:
:
:
:
:
:
:
: No. 561 EDA 2026

Appeal from the Order Entered January 22, 2026
In the Court of Common Pleas of Pike County Civil Division at No(s):  CP-52-DP-0000014-2024

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED JULY 14, 2026**

Appellant, R.E.S. ("Guardian"), appeals from the order entered in the Pike County Court of Common Pleas, which changed the permanency goal for D.S. ("Child") from reunification to adoption.  We affirm.

The trial court opinion sets forth the relevant facts and procedural history of this case as follows:

> [The] court adjudicated [Child, who was born in April of 2012,] a dependent child by order dated October 24, 2024, having determined that [C]hild was without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals.  Our order of adjudication and disposition removed [Child] from the care of [Guardian] and granted [Pike County Children and Youth Services ("CYS")] legal and physical custody of [Child].  [Guardian is Child's paternal grandfather and was Child's legal guardian

when the court adjudicated Child dependent.[1]]

In support of [the court's] determination was the credible and compelling testimony of Theresa Fonalledas, a case worker with Justice Works who was providing in-home services prior to [the] adjudication. Ms. Fonalledas testified that she personally observed [Guardian] strike [C]hild forcibly in the head, repeatedly call [C]hild derogatory and demeaning names regarding his intelligence and weight, tell Child that he would be taken away from home to upset him, and share inappropriate adult matters with [C]hild. Ms. Fonalledas further testified that [Guardian] was unable or unwilling to manage [Child's] behaviors, which included remaining awake throughout the night, watching inappropriate movies, breaking toys, wandering the neighborhood, and frequently defecating in his pants.

In further support of [the court's] determination was the credible and consistent testimony of Bernadette Parry, the CYS case worker assigned to the matter. Ms. Parry also testified that she personally observed the Guardian strike [C]hild in the head and call him derogatory names. She likewise testified that [Guardian] engaged [Child] in inappropriate adult conversations.

Ms. Parry testified that [CYS] attempted to provide [Guardian] with instruction in appropriate parenting techniques without success. [CYS] was unable to persuade [Guardian] to obtain and follow through with necessary services for [Child]. Due to [Child's] behavioral difficulties, [Child] had been removed from his public school and placed in an alternative educational setting.

Also in support of [the court's] determination was credible testimony from Brian Fazio, a representative from Children's Counseling Services in Honesdale, and Kelsi Renninger, clinical director of Matrix, both of whom testified to [Child's] poor hygiene and [Guardian's] failure to bring [C]hild for services. Dr. [Muhammad Akram] Khan, a child psychiatrist with the Children Service Center, credibly testified that

_____

[1] Child's natural parents participated in the proceedings but are not parties to this appeal.

- 2 -

[Guardian] removed [Child] from a prescribed medication regimen without medical supervision, placing [C]hild at risk.

\*    \*    \*

[The c]ourt held regular permanency review hearings and carefully considered the factors set forth at 42 Pa.C.S.A § 6351(f) at each review….

The first permanency review hearing in this matter occurred on February 10, 2025.    At that time [Guardian] demonstrated minimal compliance with the permanency plan and … made no progress toward alleviating the circumstances that led to placement.

A second permanency review hearing was held on April 16, 2025.    Again, [Guardian] demonstrated only minimal compliance and minimal progress.    At that review, the [c]ourt received a telling report from [a] parental fitness evaluation completed by Dr. Bree Riley, a licensed psychologist[,] on March 30, 2025….  The report contained findings based upon testing and interviews with [Guardian] as well as professional opinions and recommendations.  The report assessed [Guardian's] fitness with respect to [Child]. [Guardian did] not offer…anything to counter the report.

\*    \*    \*

At the August 8, 2025 permanency review hearing, [Guardian] again demonstrated minimal compliance and minimal progress….  Physical abuse, verbal aggression, and physical aggression [were] brought up.  Further, evidence [was presented] that [C]hild experienced emotional trauma during and after a July 14, 2025 visit when [Guardian] improperly produced a photograph of [Child's] half-sibling during a visit at [C]hild's placement facility.  Following that visit, [C]hild began defecating in his pants with increased frequency….

At the November 20, 2025 permanency review hearing, [Guardian] demonstrated no compliance and no progress toward alleviating the circumstances that led to removal. Due to the trauma the visits [with Guardian] were continuing to cause [C]hild, and with concurrence of the

guardian *ad litem* [("GAL"), Attorney Leatrice Anderson], the [c]ourt suspended visitation, finding [Guardian] posed a grave threat to [Child] and that visitation was contrary to [C]hild's well-being.

At the January 21, 2026 permanency review hearing, Guardian was again [not] in compliance and … made no progress toward alleviating the circumstances that led to removal.

\* \* \*

[Meanwhile, the GAL] requested [that separate] counsel be appointed for [C]hild [because] she felt that [C]hild's best interest and legal interest may have diverged. As such, [the court] appointed Attorney Oressa Campbell as counsel for [Child] by order dated June 11, 2025. [Attorney Campbell was also appointed as GAL for Child's half-sister in another ongoing dependency case involving Guardian.] [The court] inquired as to whether she believed she had a conflict of interest and in front of all counsel, she stated that she did not. Counsel for Guardian [filed] a motion for inquiry of potential conflict of interest for appointment of counsel for the minor child [on] January 20, 2026. Before the proceedings on January 21, 2026, the [c]ourt conferenced with all counsel to discuss the motion. It was agreed that [C]hild's best interest and legal interests no longer diverged, and counsel for [C]hild was relieved of her duties.

(Trial Court Opinion, filed 3/18/26, at 1-8) (internal footnotes omitted).

At the permanency review hearing on January 21, 2026, CYS requested that the permanency goal be changed to adoption. By order entered on January 22, 2026, the court changed Child's permanency goal from reunification to adoption. Guardian filed a timely notice of appeal and contemporaneous concise statement on February 20, 2026.

Guardian raises the following issues for our review:

Did the [court] err in suspending visits between [Guardian]

- 4 -

and [Child] prior to the goal change hearing without sufficient evidence, and thus making reunification impossible.

Did the [court] err in granting the goal change from reunification to adoption where the court failed to properly consider [Guardian's] compliance with the permanency plan and efforts towards alleviating the circumstances which necessitated the original placement.

Did the court err in appointing counsel for [Child] who was the [GAL] for [Child's] half-sister in a separate dependency proceeding.

(Guardian's Brief at 4) (reordered for purpose of disposition).

In his first issue, Guardian contends that he and Child had a substantial bond prior to the court suspending his visitation rights. Guardian asserts that "the evidence from the proceeding did not clearly show that the Guardian suffered from severe mental or moral deficiencies, or that continued supervised visitation posed a grave threat to [Child]." (*Id.* at 25). Furthermore, Guardian claims that there is no evidence that Guardian acted inappropriately during visits or that Guardian caused Child's negative behaviors. Guardian concludes that the court erred in suspending his visitation rights, and that this Court should reinstate Guardian's visits with Child. We disagree.

The relevant scope and standard of review in dependency cases is as follows:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise

our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*Interest of D.M.D.-C.*, 217 A.3d 279, 283-84 (Pa.Super. 2019) (quoting *In re W.M.*, 41 A.3d 618, 622 (Pa.Super. 2012)).

At each permanency review hearing, the court must consider "whether the visitation schedule for the child with the child's guardian is adequate, unless a finding is made that visitation is contrary to the safety or well-being of the child." Pa.R.J.C.P. 1608(d)(1)(xvii).

The standard against which visitation is measured … depends upon the goal mandated in the family service plan. Where … reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If … the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children.

The grave threat standard is met when the evidence clearly shows that a parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*In re C.B.*, 861 A.2d 287, 293-94 (Pa.Super. 2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005) (internal citations and quotation marks omitted).

Moreover, clear and convincing evidence must support the court's

determination:

> In reviewing a trial court's denial of visitation, [this Court] look[s] to whether there exists clear and convincing evidence that visitation would present a grave threat to the child. When making this determination, we must take into consideration the express legislative policy of preservation of the family. Therefore, the trial court is required to consider options such as structured visitation with the aid of an agency; only where there are no practicable visitation options can visitation be denied.

*Interest of L.B.*, 229 A.3d 971, 977 (Pa.Super. 2020) (quoting *In Interest of Coast*, 561 A.2d 762, 772 (Pa.Super. 1989)).

Instantly, the trial court found that the visits with Guardian were causing Child serious emotional trauma resulting in trauma responses that were detrimental to Child's wellbeing. Specifically, on July 14, 2025, Guardian showed Child a picture of Child's half-sibling while visiting Child. "Following that visit, [Child] was upset and had more frequent defecation. The [treatment] facility … report[ed that Child's] defecation [was] a trauma response to the visitation." (Permanency Review Order, filed 8/8/25, at 2). The court initially considered suspending Guardian's visitation at the permanency review hearing on August 8, 2025. The court did not do so at this hearing based on the GAL's recommendation that visitation should continue at that time because Child "would need closure as opposed to simply being cut off from Guardian." (*Id.*)

Guardian visited Child again on September 19, 2025. After this visit, Shaun Gatewood, a mental health professional who treated Child at Diversified

Treatment Alternative Centers, wrote a letter recommending visitation be suspended. Mr. Gatewood wrote that Child "presented significant challenges" after a visit with Guardian, and "presented as dysregulated for several days post visitation." (Motion to Suspend Visitation-Ex. A, filed 10/17/25). Specifically, Mr. Gatewood reported that Child "struggled with aggressive verbalization of cursing and screaming at staff and peers[,] … engaged in throwing rocks at the building and toward vehicles[, and had] considerable challenges with statements [saying] he was going to kill himself and hurt others" after the visitation with Guardian. (*Id.*)

On October 17, 2025, the GAL filed a motion to suspend Guardian's visitation rights, attaching the letter from Mr. Gatewood. The court granted the order to temporarily suspend Guardian's visitation rights that same day. At the permanency review hearing held on November 19, 2025, the court heard testimony regarding whether Guardian's visitation rights should continue to be suspended. Mr. Gatewood testified as follows:

> [COUNSEL:] Based upon the visitation that [Child] had with [Guardian] can you explain to the court a little bit what his behaviors looked like after those visits?
>
> [WITNESS:] Sure. So, after visitation [Child] had significant emotional dysregulation which presented behaviorally and that would show up through random emotional outbursts like crying spells, argumentative, verbally aggressive towards peers and staff and that would [look like] making harsh statements or comments towards staff about their family, their appearance, a lot of profanity involved in that and then additionally multiple elopements from the property and destruction of property.

- 8 -

[COUNSEL:] Did you find that those behaviors were **significantly** worse after visitation than in his normal day-to-day?

[WITNESS:] Yes.

(N.T. Permanency Review Hearing, 11/19/25, at 42-43) (emphasis added).

During cross-examination, Mr. Gatewood acknowledged that he could not say definitively that Child's negative behavioral responses were caused by visits with Guardian. Nevertheless, he noted that there was a correlation between Guardian's visits with Child and Child's negative behaviors. At the conclusion of the hearing, the court determined that visitation should remain temporarily suspended because visitation with Guardian was a threat to Child's physical, emotional and mental safety.

The record supports the court's conclusion. *See Interest of D.M.D.-C., supra*. The evidence demonstrates that visits with Guardian led to serious emotional dysregulation for Child, resulting in trauma responses of defecating in his pants, destruction of property, and threats of self-harm and harm to others. As such, we cannot say that the court abused its discretion in finding that Guardian's visits with Child posed a grave threat to Child. *See Interest of L.B., supra*; *In re C.B., supra*. Therefore, we discern no error in the court's decision to suspend Guardian's visitation with Child. *See Interest of D.M.D.-C., supra*.

In his second issue, Guardian alleges that he was complying with the permanency plan. Specifically, Guardian asserts that, "[p]roblematically,

many of the tasks in the plan were not checked off as completed, despite the Guardian completing and actively complying with the tasks." (Guardian's Brief at 18). Further, Guardian contends that "the caseworker's testimony was conflicting" by stating that Guardian "made no compliance and no progress" when he had in fact completed some of the tasks on the plan. (*Id.*) Guardian concludes that the court erred in finding that a goal change to adoption was in Child's best interests, and this Court should vacate the goal change order. We disagree.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822–23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

### § 6351. Disposition of dependent child

\* \* \*

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

\*   \*   \*

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)   If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)   If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)   If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)   If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\*   \*   \*

**(f.2) Evidence**.—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, … shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g)**   **Court order**.—On the basis of the determination

> made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823.

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, … 943 A.2d 973, 978 [(Pa.Super. 2008)], *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). *See also In re S.B., supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the

needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010) (emphasis in original).

Here, the court held five permanency review hearings between October 2024, when the court adjudicated Child dependent, and January 2026, when the court changed the goal to adoption. At each permanency review hearing, the court assessed Guardian's adherence to the permanency plan and the steps Guardian was taking to alleviate the circumstances which necessitated the original placement. Across the hearings, the court consistently found that Guardian failed to achieve anything more than minimal compliance with the permanency plan and minimal progress towards alleviating the circumstances that led to the placement.

Specifically, the April 2025 permanency review order notes that "[d]espite [Guardian] having participated in multiple services such as parenting, anger management, and visit coaching, he does not follow through with the recommendations nor utilize the skills learned when handling [Child]." (Permanency Review Order, filed 4/16/25, at 3). Similarly, the August 2025 permanency review order states that "[Guardian] has completed several parenting, anger management, therapy, and visit coaching sessions. However, [Guardian] reportedly does not follow through with the

- 14 -

recommendations or utilize the skills when parenting [Child]." (Permanency Review Order, filed 8/8/25, at 2).

Further, at the goal change hearing on January 21, 2026, Kimberly Martin, the CYS caseworker for Child's case, testified that Guardian failed to make adequate progress with the permanency plan. On cross-examination, Ms. Martin acknowledged that Guardian completed some of the tasks in the permanency plan. However, Guardian did not take the recommended steps to demonstrate meaningful progress. For instance, Ms. Martin noted that while Guardian had moved and provided a new address to CYS, Guardian had not found stable housing as required by the permanency plan because his current housing was temporary. As another example, Ms. Martin explained that although Guardian completed a nurturing parent course, Guardian's "ending score evaluation was lower than his initial score" and that Guardian would not be offered the class again because "he has done it multiple times." (N.T. Permanency Review Hearing, 1/21/26, at 43).

Additionally, the court noted that Guardian had a history of causing Child trauma, which necessitated the suspension of Guardian's visits with Child. The court interviewed Child at the onset of the hearing on January 21, 2026. When Child was asked if he wanted to go back to Guardian's care, Child stated, "I do not want to go back there[.] I want to be adopted by this family, because I feel like it's a better opportunity for me to be adopted." (N.T. Permanency Review Hearing, 1/21/26, at 18). The court further noted that "based upon

its observations throughout these proceedings, … [Child] appears to be flourishing since visitation with [Guardian] ceased and [Child] has been placed in appropriate foster care." (Permanency Review Order, filed 1/22/26, at 6).

On this record, we cannot say the court abused its discretion in changing the permanency goal from reunification to adoption. *See In re N.C., supra*. Guardian's lack of meaningful progress on the permanency plan over the course of fifteen months, as well as Child's distress following interactions with Guardian, supported the court's conclusion that the goal change to adoption was in Child's best interest. *See In re R.M.G., supra*.

In his final issue, Guardian contends that there was a conflict of interest when Attorney Campbell, Child's legal counsel, served concurrently as Child's half-sister's GAL in ongoing proceedings with Guardian. Guardian asserts that Attorney Campbell could not have simultaneously represented Child's wishes, which at the time were to reunify with Guardian, while also representing Child's half-sister's best interests, for which Attorney Campbell supported changing the goal from reunification with Guardian to adoption. Based on this conflict, Guardian argues that Attorney Campbell was unable to act as Child's counsel, and that Child "was effectively without legal counsel for a lengthy period of the dependency action." (Guardian's Brief at 31). Guardian concludes that the lack of representation prejudiced Guardian at the goal change hearing, and this Court should vacate the order changing the goal change to adoption. We disagree.

"In cases involving children, the law acknowledges two separate and distinct categories of interest: a child's legal interests, which are synonymous with the child's preferred outcome, and a child's best interests, which the trial court must determine." *In re Adoption of L.B.M.*, 639 Pa. 428, 432, 161 A.3d 172, 174 (2017) (internal footnotes omitted). More specifically:

> 'Legal interests' denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation. 'Best interests' denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees.

*In re T.S.*, 648 Pa. 236, 240 n.2, 192 A.3d 1080, 1082 n.2 (2018).

"Section 2313(a) [of the Domestic Relations Code] requires counsel to advocate on behalf of the children's legal interests" in termination of parental rights and adoption cases. *In re Adoption of L.B.M., supra* at 444, 161 A.3d at 182. Specifically, the statute provides:

> The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a). Further, "a single attorney cannot represent a child's best interests and legal interests if those interests conflict," and "the [O]rphans' [C]ourt must determine whether counsel can represent the dual interests before appointing an individual to serve as [GAL]/counsel for child."

- 17 -

*In re Adoption of K.M.G.*, 663 Pa. 53, 82, 240 A.3d 1218, 1236 (2020). "[T]he failure to appoint a separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis," and the issue is "non-waivable, because the right belonged to the child who, given that he or she was unrepresented, could not have challenged the lack of counsel." *Id.* at 81-82, 240 A.3d at 1235.

Additionally, the Pennsylvania Rules of Professional Conduct provides in relevant part:

> **Rule 1.7.  Conflict of Interest: Current Clients**
>
> a) Except as provided in paragraph b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>
> > 1)    the representation of one client will be **directly adverse** to another client; or
> >
> > 2)    there is a significant risk that the representation of one or more clients will be **materially limited** by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer

Pa.R.P.C. 1.7(a), (b)(1) (emphasis added).

Here, the GAL requested counsel be appointed for Child on June 9, 2025, because Child's best interests and legal interests diverged.  Specifically, at the time, Child wished to reunify with Guardian.  In response, the court appointed Attorney Campbell as legal counsel for Child on June 11, 2025.  At that time, she was also serving as GAL for Child's half-sister in proceedings with

Guardian. At the time of appointment, Attorney Campbell was questioned as to whether she felt comfortable taking the role as Child's legal counsel. Attorney Campbell represented that she was familiar with both cases and did not believe there was a conflict of interest such that she could not fully perform her duties in both roles. Guardian did not object at the time of appointment.

On January 20, 2026, Guardian filed a motion for inquiry into a potential conflict of interest to determine if there was a conflict of interest in Attorney Campbell's representation of Child and Child's half-sister. In Guardian's motion for inquiry into the potential conflict of interest, he asserted that:

> 3. [A] conflict was identified whereby [Child] sought visits with his sister, and that the counselors in [sister's] matter were advising against same.
>
> 4. That upon recollection and belief, the above referenced conflict was not only raised by undersigned, but by [Child's counsel] herself to this honorable court.
>
> * * *
>
> 10. That as a concurrent conflict may have already occurred, … the only recourse appropriate … is for [Child's attorney] to withdraw.

(Motion for Inquiry into Potential Conflict of Interest, filed 1/20/26, at 1-2).

At the beginning of the hearing on January 21, 2026, the court discussed the concerns with all parties. When explaining her position, Attorney Campbell noted that any potential conflict of interest was resolved "because [she] asserted [Child's] interest [in having visits with his sister], but it was unachievable based upon [the therapeutic recommendation for Child's half-

- 19 -

sister].” (N.T. Hearing, 1/21/26, at 6).

Additionally, the GAL informed the court that Child no longer wanted to live with Guardian, and as such there was no longer a need for separate legal counsel. Attorney Campbell confirmed that “[Child’s] position is now in sync with what … the [GAL] is recommending to be in his best interests, so … I am not really sure that there is a necessity for legal counsel.” (*Id.* at 5). The court agreed that Child’s best and legal interests were aligned, and as a result, Child no longer needed separate counsel. Accordingly, the court marked Attorney Campbell’s presence as withdrawn and determined that Child’s GAL would serve as Child’s legal counsel as well because Child’s interests no longer diverged.

The record does not support Guardian’s assertion that there was a conflict of interest at the time Attorney Campbell was appointed. Attorney Campbell, who was familiar with both cases, affirmed that she could accurately represent Child’s legal interests while simultaneously advancing his half-sister’s best interests. There is no indication in the record that Child’s legal interests and his half-sister’s best interests were directly adverse to one another. Additionally, there is no indication in the record that serving as GAL for Child’s half-sister in any way hindered Attorney Campbell’s ability to represent Child’s legal interests in this case. While she was representing Child, Attorney Campbell successfully ascertained Child’s wants and advocated on Child’s behalf with no conflicts. On this record, we discern no error with the

court's determination that Attorney Campbell did not have a conflict of interest when she was appointed at Child's counsel. ***See*** Pa.R.P.C. 1.7(a). ***See also In re L.J.***, 691 A.2d 520, 529 (Pa.Super. 1997) (holding no conflict of interest exists when counsel represented siblings in ongoing dependency proceedings because siblings' interests were not directly adverse, representation was not materially limited, and counsel asserted child's interests accordingly).

Even when a potential conflict of interest subsequently arose due to Child's wish to have visitation with his half-sister, the record demonstrates that Attorney Campbell continued to accurately represent Child's wishes. ***See In re T.S., supra***. Further, when the potential conflict arose, the court immediately removed Attorney Campbell as Child's counsel and appointed the GAL to serve in that role after concluding that Child's legal interests and best interests were aligned. ***See In re Adoption of K.M.G., supra***. As such, there is no support for Guardian's claim that Child was effectively without legal counsel for a large portion of this case. Accordingly, Guardian is not entitled to relief of any of his issues on appeal, and we affirm the order changing the permanency goal for Child from reunification to adoption.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>7/14/2026</u>